UNITED STATES of America,
Plaintiff-Appellee,

v.

Israel TORRES, Defendant-Appellant.

No. 85–2046.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1987.

Decided Jan. 15, 1987.

Philip C. Parenti, Chicago, Ill., for plaintiff-appellee.

Ruben Castillo, Asst. U.S. Atty. (U.S. Atty., Anton Valukas), U.S. Atty's Office, Chicago, Ill., for defendant-appellant.

Before CUDAHY, COFFEY, and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

Israel Torres appeals his conviction before the Honorable Milton I. Shadur, United States District Court for the Northern District of Illinois, Eastern Division, for robbery, conspiracy, aiding and abetting and conversion of government property. We affirm.

I

The defendant Torres was convicted for his alleged participation in the robbery of a government agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), Eduardo Fernandez, which occurred during a meeting the agent had arranged with Torres for the purpose of purchasing his (Torres) .357 handgun. At the meeting "to look Fernandez over" on a street corner in Chicago, Illinois on July 25, 1984, Torres observed that Fernandez was wearing gold chains and gold medallions, and believed that Fernandez was carrying a large sum of money. Fernandez was electronically wired to record and transmit his conversation to the AFT surveillance team working with him.

The defendant Torres, accompanied by Antonio Garcia, advised Fernandez that his gun was still at home, but he would return with it shortly. According to Torres' later confession to an ATF agent,[1] after Torres and Garcia walked away from Fernandez, they discussed "how they could rob (Fernandez)." When Torres and Garcia returned to Fernandez, Torres informed Fernandez that he now had the gun with him but hesitated to consummate the sale for he feared the police were nearby. Torres convinced Fernandez to drive around the corner to a more secluded place and to remain in his car. At this time, Fernandez requested Torres to hand over the gun to allow him to inspect it.

Fernandez followed Torres and Garcia around the corner and Torres parked his motorcycle approximately fifty feet from Fernandez's car. While Torres remained near his cycle, Garcia and a third man approached Fernandez.[2] The other man pulled a gun on Fernandez, held it against his head, and ordered Fernandez to turn over his money. Antonio Garcia ripped the gold chains and medallions from Fernandez's neck, and grabbed the $255 in U.S. government funds that Fernandez had in his pocket. As the ATF surveillance team arrived, Antonio Garcia and the man holding the gun fled on foot. Torres was arrested while sitting on his motorbike.

Torres was indicted and charged with conspiracy to rob Fernandez of United States' property, in violation of 18 U.S.C. §§ 371 and 2112; robbery of Fernandez, in violation of 18 U.S.C. § 2112 and § 2 (holding an aider and abettor liable as a principal); converting $255.00 in United States' funds, in violation of 18 U.S.C. §§ 2 and 641; assault with a deadly weapon in violation of 18 U.S.C. § 111; and using a firearm to commit a felony (robbery) in violation of 18 U.S.C. § 924(c). The jury found Torres guilty of conspiracy, robbery, and conversion. The jury acquitted Torres of

---

1. Torres does not challenge the trial court's admission of the oral confession.

2. The government attempted to prove at trial that Enrique Garcia was Antonio Garcia's brother. The jury acquitted Enrique Garcia.

assault with a deadly weapon and felony with a firearm.

The court entered judgment against Torres on June 7, 1985 for conversion of government property and sentenced him to seven years of imprisonment, and seven years imprisonment concurrently for robbing Fernandez. On the conspiracy to rob charge, Torres was sentenced to five years probation, to commence upon his release from confinement.

## II

Torres presents four issues on appeal. Initially, he questions the sufficiency of the evidence to convict him of robbery and conspiracy to rob. Next, he argues that the government's closing argument improperly interjected the "prosecutor's personal opinion, his oath of office, and the weight and prestige of the United States Attorney's Office...." Finally, he appeals the trial court's sentence of seven years confinement on the robbery conviction contending that the court relied on improper information.

## 1. *Sufficiency of the Evidence*

Torres contends that viewing the evidence in the light most favorable to the prosecution, the government did not establish that a rational trier of fact could have found him guilty beyond a reasonable doubt of the essential elements of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Torres

argues that his acquittal of assault with a deadly weapon and conviction for robbery are inconsistent in that the "taking by threat or force" necessary to support a conviction for robbery could only have been accomplished by the use of the gun which formed the basis for the assault with a deadly weapon charge against him. Thus, Torres argues since the jury concluded there was no "forceable assault," there could not have been a "taking by threat or force." [3] In other words, because the robbery of Fernandez involved the use of a firearm, the jury should have either acquitted Torres of robbery under § 2112 *and armed* robbery under § 924(c)(1) and forceable assault with a deadly weapon under § 111, *or* found him guilty of armed robbery (§ 924(c)(1)), forceable assault with a deadly weapon (§ 111), and robbery under § 2112. Although Torres concedes that "a criminal defendant convicted by a jury on one count (may) not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count," *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 473, 83 L.Ed.2d 461 (1984), he maintains that the inconsistent verdicts establish that the evidence supporting his robbery convictions is insufficient and therefore these convictions must be reversed.

In *Powell*, the Supreme Court wrote:

"Where truly inconsistent verdicts have been reached, 'the most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury

---

**3.** The statutes involved read:

18 U.S.C. § 2112: [Robbery]
"Whoever robs another of any kind or description of personal property belonging to the United States, shall be imprisoned not more than fifteen years."
We note that for purposes of § 2112, robbery is a "larceny from the person through force or the threat of force." *United States v. Rivera*, 521 F.2d 125, 128 n. 5 (2d Cir.1975).
18 U.S.C. § 111: [Assault with a Deadly Weapon]
"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in § 1114 of this title while engaged in or on account of the performance of his official duties, [and] ... in the commis-

sion of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."
(18 U.S.C. § 1114 includes ATF officers.)
18 U.S.C. § 924(c)(1): [Felony with a Firearm]
"Whoever ... uses a firearm to commit any felony for which he may be prosecuted in a court of the United States ... shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years...."
(§ 924 has, since the time of this offense, been amended. The new version will take effect November 1, 1986.)

did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'

... The rule that the defendant may not upset such a verdict embodies a prudent acknowledgement of a number of factors. First, ... inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the government has no recourse if it wishes to correct the jury's error; the government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.... Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored.... The fact that the inconsistency may be the result of lenity, coupled with the government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable. We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity but of some error that worked against them."

105 S.Ct. at 477, 478 (footnote omitted).

Torres asks us to assume that the inconsistency in the jury verdicts is the result of the government presenting insufficient evidence to support his conviction. We will not make this assumption because "it is equally possible that the jury, convinced of

guilt, [beyond a reasonable doubt] ... through mistake, compromise, or lenity arrived at an inconsistent conclusion" with respect to the offenses requiring use of a weapon.[4] *Powell,* 105 S.Ct. at 477. Further, "sufficiency of the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." *Powell* at 478. Therefore, as long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" we may not overturn the verdict. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). "This review should be independent of the jury's determination that evidence on another count was insufficient." *Powell,* 105 S.Ct. at 478. Therefore, as the Supreme Court noted in *Powell:* "with few exceptions ... once the jury has heard the evidence and the case has been submitted ... [the parties] must accept the jury's collective judgment." *Id.* at 478.

The thrust of Torres' argument is that the jury's alleged inconsistent verdicts support his claim that the government failed to prove that he knew of the existence of the firearm that was used in the commission of the robbery beyond a reasonable doubt. He insists and assumes that because there is no direct evidence that he knew about that firearm, he could not possibly have aided Garcia in robbing Fernandez with a weapon, since, according to his version, being ignorant of the weapon, he could not possibly "share [Garcia's] ... criminal intent." *United States v. Pope,* 739 F.2d 289, 291 (7th Cir.1984). In other words, he argues that "[although] [t]his evidence may support a conclusion that Torres intended to 'take' the money ... [i]t is not proof beyond a reasonable doubt that he knew about or intended that the taking would be accomplished by the force of a handgun."

---

**4.** The trial judge was convinced that "the reason ... for jury acquittal with respect to [the charges requiring use of a gun] can best be explained by the [jury's] notion that somehow to be convicted of the offense that carries a fire-

arm with it, that there had to be some kind of close nexus ...", i.e., a "direct [ ] link [ ] with the actual use of the weapon...." (Tr. 7, 37, June 7, 1985).

This argument is without merit for two reasons. First, robbery, as contrasted with armed robbery, does not require the possession or use of a deadly weapon. Robbery under 18 U.S.C. § 2112 requires only that the government establish that the taking was by force or threat of force. *United States v. Rivera*, 521 F.2d 125 (2d Cir.1975). Furthermore, the "forceable assault" necessary for a conviction under the assault with a deadly weapon statute is not the same as the "taking by force or threat of force" necessary for a conviction under the robbery statute. Therefore, Torres is in error when he contends that the government must establish that he and Garcia shared a criminal intent to use a firearm in the commission of the robbery. Secondly, it is clear that the government need not establish an agreement between the principal and the aider or abettor in order to support a conviction for aiding and abetting the commission of a crime. *United States v. Beck*, 615 F.2d 441, 449 n. 9 (7th Cir.1980). "[I]t is not necessary that the [aider or abettor] have knowledge of the particular means the principal in the crime uses to carry out the criminal activity." *Id.* at 453. Accordingly,

> "[C]riminal liability under the aider or abettor statute results from the existence of 'a community of intent between the [aider and abettor] and the [principal];' an aider or abettor is 'liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequences may not have been intended by him.'"

*United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir.1978). Thus, Torres' conviction must be upheld if "the evidence ... demonstrate[s] that the defendant 'was associated with a criminal venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed.'" *United States v. Galiffa*, 734 F.2d 306, 311 (7th Cir.1984) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)).

Turning to the record, it was at Torres' suggestion that Fernandez meet with Torres, at a location of Torres' choice. After "looking (Fernandez) over," Torres departed with Antonio Garcia and, according to his own confession, discussed with Garcia how they might rob Fernandez of his money and personal jewelry. We are confident that Torres and Garcia never presumed that Fernandez would "voluntarily donate" his money and jewelry to "their charitable cause," and thus they obviously contemplated the use of force or the threat of force in their plan to rob Fernandez, especially in view of the fact that Torres and Garcia were joined by a third man with a gun who was obviously part of a scheme to rob Fernandez. The jury could very reasonably have concluded that Torres and Garcia would not have planned to graciously relieve the weight-lifter Fernandez of his jewelry and money without either the use of force or the threat of force. Further, when Garcia and Torres returned, attempting to deceive Fernandez that they had the gun in their possession, they repeatedly urged Fernandez to go to a more isolated, less frequented area to consummate the gun transaction and the ultimate robbery. Had Torres and Garcia assumed that Fernandez would relinquish the money and jewelry voluntarily, there was no reason to move the robbery to a more secluded place unless they were prepared for a possible struggle or confrontation and thus they would not be seen or heard threatening and/or overpowering him. Finally, since the alleged purpose of the meeting between Torres and Fernandez was the sale of a gun, Torres could hardly have been surprised that a gun was produced and used in the robbery.

Torres' oral confession and evidence of the events preceding the robbery clearly demonstrate that Torres was associated with Garcia and the third armed man in the venture to rob Fernandez. The evidence further establishes that Torres intentionally acted to effect that robbery when he "looked Fernandez over" and discussed with Garcia how they could rob Fernandez,

urged Fernandez to move to an isolated area, and persuaded Fernandez that he possessed a gun to sell. Therefore, based upon all of the facts and circumstances and the law applicable thereto, we hold that Torres' argument that there was insufficient evidence to sustain his conviction for robbery is without merit. The government produced evidence from which "any rational" jury would conclude beyond a reasonable doubt that Torres was guilty of aiding and abetting[5] the robbery of Fernandez.

### 2. Government's Closing Argument

Torres contends that the Government's closing argument contained improper and prejudicial remarks that require reversal of his conviction. The closing arguments occupied more than seventy pages of the trial transcript, and were marked by objections from both sides. The following sections of the closing argument are relevant to our analysis of Torres' claim:

MR. PARENTI, Torres' counsel: "The government perceives the weakness ... in their case against Israel [Torres], so they came up with a few items ... [N]ow, sometime the truth only comes out in cross-examination and you've got to hope you to have the ability to bring it out. And we talked, I cross-examined Fernandez and he was rehearsed by the government—"

MR. CONWAY, Prosecutor: "Objection to that, your honor."

THE COURT: "The objection is sustained. Mr. Parenti you know that's an inaccurate characterization.... The jury will hear, as part of the instructions, that it is perfectly proper for a lawyer to interview a witness in preparation for trial. Now you may proceed."

MR. PARENTI: "Thank you, Your Honor. Call it what you want, he spent eight or nine hours with these Assistant U.S. Attorneys, going over and reviewing his testimony. Call that what you want.

\* \* \* \* \* \*

Finally, you got the government and Chicago Police Officer Cronen, knowing the weakness in this case, they come up with the icing on the case, the confession. Now, even the confession, as the government claims, ... even by their own version, Israel does not admit to even seeing a gun ... But, ... they do claim that he said he ripped off this agent ... They didn't get his consent when they taped him undercover ... they didn't get his consent then. They didn't need his consent to take a confession. They didn't get all these obvious and simple things, because a tape or transcript ... would demonstrate what Israel really said and they don't want it. They needed a confession to juice up a weak case.... Your entitled to better evidence in the United States of America...."

Garcia's counsel continued the attack on the prosecutors' integrity in his closing argument:

MR. DEUTSCH, Garcia's Counsel: "And the horror, the nightmare of being wrongly accused of a serious crime is bad enough, but to be convicted on the word of one witness, on the testimony of one witness, who—you can call it what you want—was prepared, practiced, was interviewed, for nine hours.

Now we heard how long this incident took. If you start at North Avenue and Western, all the way to the end, at the most it took a half an hour. What in God's name would require this man to be prepared for nine hours? He can come in here now and say 'It took this long. I'm convinced of that.' He's been prepared for nine hours."

The prosecutor responded:

MR. CASTILLO, Prosecutor: "Let me address one thing first. [Defense counsel] [t]alked about nine hours of preparation for Agent Fernandez. Everyone has a duty here, part of our duty, as Assistant United States Attorneys, is to prepare our witnesses. Agent Fernandez told

5. An aider or abettor is punishable as a principal under 18 U.S.C. § 2(a), which provides that "[w]hoever commits an offense against the Unit-ed States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

you, he testified three different times. Three different hearings. A victim of the crime, he came in here and testified three times. And our duty is to talk to those witnesses, and, if our duty takes us to the corner of Washtenaw and North, and the scene of the incident, then that's what we do, to find out what the facts are. You know why? Because when he hits the stand, he's going to be cross-examined by defense attorneys, just like he was here. And he's going to be asked [questions].... But if you think for one minute that Mr. Conway or I told Agent Fernandez what to do or trumped up a case against Israel Torres ... then you should acquit ... No doubt about that. If you think that the agents ... came in here and lied ... if you think he made up a confession regarding Israel Torres, well, then, if you believe that, you should not only come back 'not guilty' but you should demand that we apologize to Israel Torres and give him some type of compensation. But ask yourselves this, why aren't the confessions better then if we were making up things? ... You know why? Because they are telling the truth.... [O]ur oath is very important. The day we took that oath that was the most important day in our lives, and we're not going to violate that oath by putting on any type of perjured testimony in this case."

MR. PARENTI: "Objection, Your Honor, personalization of the U.S. Attorney."

THE COURT: "Objection is sustained. The jury will disregard that."

■ The test for determining if a prosecutor's closing statement requires reversal of a conviction is whether the remarks were so prejudicial that the defendant was deprived of a fair trial. *United States v. Peco*, 784 F.2d 798, 805 (7th Cir.1986); *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.1984); *United States v. Zylstra*, 713 F.2d 1332, 1339 (7th Cir.1983).

As this court wrote in *United States ex rel. Crist v. Lane*, 745 F.2d 476 (7th Cir. 1984):

"The heart of due process analysis in cases of alleged prosecutional misconduct is the fairness of the trial when viewed in its entirety, not the culpability of the prosecutor.... The appropriate inquiry, therefore, is not whether the prosecutor's conduct is conduct which 'is undesirable, erroneous or even "universally condemned," but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.' *Cupp v. Naughten*, 414 U.S. 141, 146 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] ... (1973)."

*Id.* at 482.

Thus, in reviewing a claim that the prosecutor's closing remarks unduly prejudiced the defendant, we focus on "the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsels' conduct, as well as the nature of the prosecutor's response, is relevant." *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985).[6] Furthermore, "it is ... well settled law [that] where the defense counsel makes remarks in closing that invite the government to respond, the prosecutor may, in rebuttal, enter into areas which would otherwise constitute improper argument." *United*

---

**6.** Contrary to the assertion in the concurring opinion I do not fail to "separate the issue of the propriety of the prosecutor's remarks from that of the effect of those remarks on the fairness of Torres' trial." I do not condone the prosecutor's comments as should be clear from the fact that I proceed to analyze the prejudicial impact it had on the defendant. Since *Lane* makes clear that the prosecutor's culpability is *not* the question, the focus of the inquiry is on the effect of the prosecutor's conduct on this trial, not on whether the prosecutor should or should not have made the comment. Further, as *United*

*States v. Mazzone*, 782 F.2d 757, 763 (7th Cir. 1986), explains, the invited response doctrine is part of the inquiry concerning the prejudicial impact of the prosecutor's statements: the doctrine "merely recognizes that the impact on the defendant from the prosecutor's misbehavior may be less if the defendant's counsel aroused the jury against the prosecutor." Thus, it is necessary to begin analyzing the prejudicial impact of the prosecutor's conduct by examining that conduct in the context of the *entire* closing arguments of both the prosecutor *and* counsel for the defendants.

*States v. Reagan,* 694 F.2d 1075, 1080 (7th Cir.1982). *See also United States v. Perez-Leon,* 757 F.2d 866, 875 (7th Cir.1985) ("Where the defense counsel refers to evidence outside the record, the government may have to respond with an argument that normally would be considered improper."); *United States v. Taylor,* 728 F.2d 930, 936 (7th Cir.1984) ("It is settled in this circuit that in their summations to the jury, prosecutors are entitled to respond to arguments articulated by defense counsel"). *See also United States v. McPhee,* 731 F.2d 1150, 1152 (5th Cir.1984) ("Pertinent factors include: (1) the magnitude of the prejudicial effect of the statements, (2) the efficacy of any cautionary instructions, and (3) the strength of the evidence of defendant's guilt"). Thus, "[a]lthough inflammatory argument may be grounds for reversal, the government should not be restricted to a sterile recitation of uncontroverted facts." *United States v. Scott,* 660 F.2d 1145, 1177 (7th Cir.1981).

In the present case, defense counsels insinuated and accused the government of providing Fernandez with "his" testimony and thus suggested that the government had offered perjured testimony in violation of the attorney's ethical obligations as a member of the bar:

> "The government perceives the weakness ... in their case against Israel [Torres], so they came up with a few items ... [N]ow, sometime the truth only comes out in cross-examination and you've got to hope you to have the ability to bring it out. And we talked, I cross-examined Fernandez and he was rehearsed by the government—"

The thrust of defense counsels' attack on the prosecution was that the prosecutors had provided their witnesses with the testimony that they gave at trial, *not* as the concurring opinion speciously asserts to direct "attention to the effect repetition may have had on the witness's recollection of events." The excerpts referred to from the transcript (at pages 433–35, *supra*) make clear that Torres' counsel continually suggested throughout his closing argument that the government had offered perjured testimony through witnesses who were "rehearsed," "practiced," and "prepared" for nine hours. In addition, he charged that the prosecutors had offered a "juiced up" [7] confession. These statements concerning the prosecutor rehearsing, practicing and preparation were made on four

---

**7.** The phrase "juiced up" implies that the government in some manner added to the confession to make it more convincing. The concurring opinion asserts that because defense counsel's suggestion that Torres' confession was "juiced up" does not specifically refer to the United States Attorney but rather mentions only the "prosecution" and the "government," the United States Attorney could not have interpreted defense counsel's statement as a personal indictment of the prosecutor's integrity. I am at a loss to understand who else he could have been referring to—the prosecutor is the "prosecution" and the "government" in a criminal proceeding. It was the prosecutors who were responsible for preparing and presenting the "government's" case. Further, the concurring opinion ignores the fact that the earlier attacks on the prosecution concerning "rehearsing," "preparing" and "practicing" its witnesses "for eight or nine hours" made specific reference to the United States Attorney. Defense counsel's accusation that the prosecutors offered a "juiced up" confession must be considered in the context as defense counsels' claim that the prosecutors spent "eight or nine hours" organizing thoughts in the minds of and putting words in

the mouths of its witnesses—including "juicing up" the testimony concerning Torres' confession. Thus, when viewing the closing arguments in the entire context of defense counsels' arguments, the United States Attorney's interpretation of defense counsels statements concerning the "juiced up" confession and "rehearsed," "prepared" and "practiced" testimony as attacking his own integrity was not unreasonable. The continued references of defense counsel to the "eight or nine hours" the prosecutors spent "rehearsing," "preparing" and "practicing" its witness cannot be interpreted, contrary to the assertion of the concurring opinion, as suggesting anything other than that "the prosecutor provided Fernandez with a false version of events." Is this not an accusation of perjury?

Further, the concurring opinion asserts that the "proper response" to the continued accusations of defense counsel after the trial court had reprimanded defense counsel "was further objection by the prosecutor." The proper response was for the trial court to admonish defense counsel for continuing to ignore an order of the court—going so far as to hold counsel in contempt should they persist in such unjustified, unprofessional and unethical conduct.

separate occasions after the judge sustained the government's objection as follows:

> "The objection is sustained. Mr. Parenti you know that's an inaccurate characterization."

But in spite of this ruling by the trial court, defense counsel continued to insinuate that the government's preparation of its witnesses was dishonest:

> "[Torres' Counsel] Call it what you want, he [the government's witness] spent eight or nine hours with these Assistant U.S. Attorneys going over and reviewing his testimony. Call *that* what you want."

Torres' counsel went on to accuse the prosecution of concocting Torres' confession:

> "[Torres' counsel] The government perceives the weakness ... in their case against Israel [Torres], so they come up with a few items.... I cross-examined Fernandez and he was rehearsed by the government.... [the government] knowing the weakness in this case, they come with the icing on the case, the confession.... They needed a confession to juice up a weak case...."

Garcia's counsel also attacked the integrity of the prosecution, accusing the government of rehearsing, practicing and preparing its witnesses which the prosecutor properly interpreted as an accusation that the government had offered perjured testimony:

> "And the horror, the nightmare of being wrongly accused of a serious crime is bad enough, but to be convicted on the word of one witness, on the testimony of one witness, who—you can call it what you want—was prepared, practiced, was interviewed, for nine hours."

These comments were clearly intended to arouse the jury's passion and ire against the prosecution and thus invited a response from the prosecutor under our holding in *Mazzone.*

■ The prosecutor responded that if the jury should believe that to be the case, it should acquit Torres. The prosecutor pointed out how sincerely he accepted the obligations of his professional oath in rebutting the defense counsel's charge that he knowingly introduced perjured testimony. As in *United States v. West,* 670 F.2d 675 (7th Cir.1982),

> "[d]efense counsel, not the government, first put the integrity of the United States Attorney's Office in issue [by commenting that 'the Government intimidated its witnesses, cajoled them into testifying favorably for the government, and, in fact, "purchased" their testimony.']. The government's response was invited and within the bounds of proper argument."

*Id.* at 689. The prosecutor's responding comments were not intended to "fight fire with fire," a practice we condemned in *Mazzone,* but were simply an attempt by the prosecutor to explain the propriety of his conduct and to undo some of the damage done by defense counsels' inappropriate and unprofessional conduct. As the Fifth Circuit explained:

> "In light of defense counsels' arguments that the Government's witnesses were ʹ *coached, programmed,* and *intimidated,* the prosecutor's statements vouching for his witnesses and asserting their bravery *were fair responses.* The prosecutor argued they were not programmed as demonstrated by their human mistakes, and by their testimony that exculpated some of the defendants. Defense counsel argued that the Government had intimidated its witnesses. In response, the prosecutor argued just the opposite, that the witnesses might be subject to as much or more intimidation at home."

*United States v. Saenz,* 747 F.2d 930, 941 (5th Cir.1984), *rehearing denied* 752 F.2d 646, *cert. denied, Solis v. United States,* —— U.S. ——, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985) (emphasis added) (footnotes omitted). In the case before us, where defense counsel accused the government of "preparing," "rehearsing," and "practicing" its witnesses and "juicing up" a defendant's confession, defense counsel's conduct is much more outrageous than was the conduct reviewed in *Saenz.* As in

*Saenz,* the prosecutor's response here was "a fair response" in light of defense counsels' scurrilous attacks on the government. Defense counsel suggested that the testimony of Fernandez was less than credible because Fernandez was not able to recount with complete and exact accuracy every detail about the robbery. For example, Fernandez was unable to testify as to the make of the car he was driving on the date of the robbery. The prosecutor argued that the testimony of agent Fernandez concerning each and every detail of the robbery was not perfect because it was testimony based on "the truth," and he went on to explain that this was Agent Fernandez's first assignment as an undercover officer and that his inexperience was evident. For example, he was unsure whether the gun used in the hold-up was a revolver or a pistol, despite special training on gun identification. In *United States v. Bright,* 630 F.2d 804, 824 (5th Cir.1980), the court stated that although a prosecutor may not vouch for the credibility of witnesses based on his own personal knowledge

> "that does not mean the prosecutor cannot argue that the fair inference from the facts presented is that a witness has no reason to lie.... The prosecutor is not obliged to sit quietly while character assaults are made on his witnesses; he is entitled to argue fairly their credibility."

It is evident from the record that the prosecutor did nothing more than point out to the jury that the agent witness was new and inexperienced but credible, in response to the unprofessional attacks of both Torres' and Garcia's counsel.

Both parties made frequent objections during the other's closing arguments. The trial judge sustained the government's objection on one occasion to the defense counsel's statement that the government "rehearsed," "prepared" and "practiced" its witness and thus insinuated that the government had offered perjured testimony:

> "[Trial Court] The objection is sustained, Mr. Parenti, you know that's an inaccurate characterization."

But even though counsel for both defendants continued to suggest in direct contravention of the trial court's order that the government had induced Fernandez to testify as he had, the court did nothing to enforce its prior order and insulate the government attorneys from further unwarranted attacks and scurrilous insinuations:

> "[Torres' Counsel] Call it what you want, [the government's witness] spent eight or nine hours with these Assistant U.S. Attorneys going over and reviewing his testimony. Call *that* what you want."

> \*    \*    \*    \*    \*    \*

> "[Torres' Counsel] The government perceives the weakness ... in their case against Israel [Torres], so they come up with a few items.... I cross-examined Fernandez and he was rehearsed by the government.... [the government] knowing the weakness in this case, they come up with the icing on the case, the confession.... They needed a confession to juice up a weak case...."

> \*    \*    \*    \*    \*    \*

> "[Garcia's Counsel] And the horror, the nightmare of being wrongly accused of a serious crime is bad enough, but to be convicted on the word of one witness, on the testimony of one witness, who—you can call it what you want—was prepared, practiced, was interviewed, for nine hours."

The court sustained an objection on the part of defense counsel to the government's assertion in closing argument that the ethical obligations of an attorney preclude an attorney from offering perjured testimony in evidence:

> "[O]ur oath is very important. The day we took that oath that was the most important day in our lives, and we're not going to violate that oath by putting on any type of perjured testimony in this case."

The record reflects that the court immediately admonished the jury to disregard the statements in the following language:

> "Objection is sustained. The jury will disregard that."

Although the trial court should have monitored the closing arguments of defense counsel more carefully, especially in view of the fact that each of the defense counsel in tandem continued their insidious attack (four more times) on the integrity of the prosecutor in spite of the court's previous direct ruling and order to the contrary. It is interesting to note though that the court did agree with defendant's attorney and admonished the prosecutor and directed the jury to disregard the statement when the prosecutor mentioned his oath of office. The prosecutor's comments about his obligations as a professional were certainly proper.

> "[O]ur oath is very important. The day we took that oath that was the most important day in our lives, and we're not going to violate that oath by putting on perjured testimony."

How else would a prosecutor answer a scurrilous insinuation repeated four times after an admonition by the court? It is not clear from the transcript whether the "oath" referred to in the closing arguments was the prosecutor's oath of office or his professional oath. However, based on the record and a review of the attorney's Code of Professional Responsibility as well as the Assistant United States Attorney's oath, and argument in the briefs on appeal, I am convinced the "oath" referred to was the prosecutor's professional oath as a member of the trial bar. The Assistant United States Attorney's oath of office, which is given pursuant to 28 U.S.C. §§ 452, 454, contains no reference to offering perjured testimony.

Whereas the *Model Rules of Professional Conduct* emphatically provide:

Rule 3.3  Candor Toward the Tribunal

(a) A lawyer shall not knowingly:

> (4) OFFER EVIDENCE THAT THE LAWYER KNOWS TO BE FALSE. IF A LAWYER HAS OFFERED MATERIAL EVIDENCE AND COMES TO KNOW OF ITS FALSITY, THE LAWYER SHALL TAKE REASONABLE REMEDIAL MEASURES.

\*     \*     \*     \*     \*     \*

COMMENT

\*     \*     \*     \*     \*     \*

False Evidence

When evidence that a lawyer knows to be false is provided by a person who is not the client, the lawyer must refuse to offer it regardless of the client's wishes.

Rule 3.4  Fairness to Opposing Party and Counsel

A lawyer shall not:

> (b) FALSIFY EVIDENCE, COUNSEL OR ASSIST A WITNESS TO TESTIFY FALSELY, ..."

Thus, it is evident the prosecutor could not have been referring to his federal oath of office since unlike his professional oath which incorporates the Code of Professional Responsibility's proscriptions against perjured testimony, his United States Attorney's oath makes no reference to perjured testimony. The concurring opinion's suggestion that because the prosecutor "only referred to his fellow Assistant United States Attorney" when "other members of the bar [were] present in the courtroom" the prosecutor could only have been referring to his oath of office, is unconvincing. Since, there were other members of the bar present in the courtroom, but only the integrity of the United States Attorneys was put in issue by defense counsel, there was no reason for the prosecutor to make his response a defense of the bar in general.

A logical reading of the record discloses there is not a shred of evidence to establish an inference in support of the concurring opinion's claim that the prosecutor's reference to his oath "placed him in the inappropriate role of a witness." The prosecutor accurately described the manner in which he reviewed the testimony of each of his witnesses with the respective witnesses before trial. As the trial judge explained to the jury,

> "it is perfectly proper for a lawyer to interview a witness in preparation for trial,"

and an attorney who does not question, rehearse and prepare his witnesses before

**440**

trial is not properly prepared for trial. But defense counsel continued to insinuate that the government had improperly prepared its witnesses:

> "[Torres' Counsel] Call it what you want, the [government's witness] spent eight or nine hours with these Assistant U.S. Attorneys going over and reviewing his testimony. Call *that* what you want."

> \*   \*   \*   \*   \*   \*

> "[Torres' Counsel] The government perceives the weakness ... in their case against Israel [Torres], so they come up with a few items.... I cross-examined Fernandez and he was rehearsed by the government.... [the government] knowing the weakness in this case, they come with the icing on the case, the confession.... They needed a confession to juice up a weak case...."

> \*   \*   \*   \*   \*   \*

> "[Garcia's Counsel] And the horror, the nightmare of being wrongly accused of a serious crime is bad enough, but to be convicted on the word of one witness, on the testimony of one witness, who—you can call it what you want—was prepared, practiced, was interviewed, for nine hours."

Furthermore, after reviewing the record, I am confident that the prosecutor accurately interpreted defense counsel's callous accusations that the government's case was based on perjured testimony as a challenge to his own integrity and thus his defense of his own professional ethics was certainly relevant to the scurrilous accusations cast upon his character by defense counsel. As in *United States v. Peco*, 784 F.2d at 810,

> "[t]hese comments were directly responsive to the defense's insinuations."

To hold that an attorney accused of inducing perjured testimony cannot explain that he was merely doing what an ethical attorney is required to do in preparation for trial would undermine the concept of fairness which underlies the American system of justice. Indeed, in *United States v. Saenz, supra*, the prosecution went so far as to suggest that it only prosecuted the

guilty. But the court held no reversible error had been committed because

> "[t]he defense, ... had directly attacked the prosecutor's integrity in maintaining the prosecution, and had accused the prosecutor of abusing the system."

747 F.2d at 942. Quoting from *Saenz*, the court stated:

> "This case was obviously hard fought by all parties. The closing arguments reflect this battle. One defense counsel argued that the prosecution had intimidated witnesses, and coached witnesses like mechanics. He argued that the prosecutor was unfair, untruthful, had 'abused the system,' had attempted to hide an unfavorable exhibit at trial, and had put people on trial who were not there to defend themselves. He concluded with the following attack:
>
> > I can't respond to Mr. Wolfe. He is a good lawyer. He is going to come up and say all kinds of things about me. I will tell you one thing, I am looking at him eyeball to eyeball and I'll tell you, Jack Wolfe, you were not fair with Olga Uresti.
> >
> > ... I am telling you right now, you played dirty in this case. And that's not right. You have abused your privilege as an Assistant United States Attorney. She is not guilty.
>
> Another defense counsel argued that the prosecutor was an 'unfair man,' and also insinuated that the prosecutor was not acting in good faith. Defense counsel asserted that the witnesses were 'programmed,' while another argued that it was 'very easy to get these people to admit something when they are being asked.' Defense counsel directly attacked the credibility of the Government's witnesses:
>
> > I can't recall the evidence in this first case and I was taking notes, and you expect these ladies, who have been sick, who didn't make a mental notation, who don't know how to write their names, to remember, remember very clearly in their minds, *without*

*coaching*, that something happened a year-and-a-half ago.

I am not trying to knock anybody down, but I will tell you one thing, they sure have some sharp minds around here. Those folks can remember a lot of things.

In light of these personal attacks on the prosecutor and the direct attacks alleging that the witnesses' testimony was programmed, the result of intimidation, and not credible the prosecutor's rebuttal statements, while not to be condoned, do not rise to reversible error.

\*     \*     \*     \*     \*     \*

In light of defense counsels' arguments that the Government's witnesses were coached, programmed, and intimidated, the prosecutor's statements vouching for his witnesses and asserting their bravery were fair responses. The prosecutor argued they were not programmed as demonstrated by their human mistakes, and by their testimony that exculpated some of the defendants. Defense counsel argued that the Government had intimidated its witnesses. In response, the prosecutor argued just the opposite, that the witnesses might be subject to as much or more intimidation at home."

*Saenz*, 747 F.2d at 939–940, 941 (footnotes and citations omitted). Rather than make a hero of defense counsels in light of their highly questionable and unprofessional conduct as the concurrence does, I believe both defense attorneys should have been reprimanded for continuing to falsely accuse the prosecutor of using perjured testimony (on four separate occasions) after they were admonished, in direct defiance of the trial judge's previous order sustaining the prosecution's objection.

■  Torres also contends that the prosecutor's reference to his Puerto Rican heritage was improper argument. The concurring opinion accepts Torres' assertions at face value noting:

"[t]his remark was obviously improper because the prosecutor's heritage was irrelevant. Nor can the remark be condoned as an 'invited response' to an accusation that the prosecution was racially motivated."

The concurring opinion completely ignores the defense counsels' continual references to the Puerto Rican or Latin heritage of Garcia, Torres, and agent Fernandez. On six different occasions during closing argument, defense counsel unnecessarily referred to the Puerto Rican or Latin heritage of the defendants and witness. The only inference that can be drawn from defense counsels' repeated comments about the defendants' heritage was that the prosecution of Torres and Garcia was racially motivated—that they were singled out for prosecution because they were Hispanic. Defense counsel's closing argument in part stated:

"[Torres' Counsel] About 200 years ago, our forefathers fought for freedom from tyranny, and a tyrannical reign could exist in this country if the Government could willy-nilly arrest and jail people, without a fair trial. It's happened around this world.

There was a guy named Adolf Hitler in Germany, our friend Ayatollah Khomeini in Iran, and the infamous Muammar Gaddafi in Libya. You've heard of him. But in April of 1775, through October of 1981, this really happened, it's not just in the history books, we fought an armed revolution from Great Britain to free ourselves from things like debtor's prison, taxation without representation and tyranny. And a lot of men fought and died, a lot of Americans fought and died for our freedom.

Remember a man named Patrick Henry, 'Give me liberty or give me death.' How about Nathan Hale, who was hanged by the British, 'I regret that I have but one life to lose for my country.'

We won that revolution, fortunately, and the main tenet of that revolution was freedom. Witness the Declaration of Independence. Fourth of July, 1776. *'We hold these truths to be self-evident that all men are created equal.' Even Israel Torres and Enrique Garcia.*

The constitutional architects thought that the ultimate buffer between the citizens and the Government is a jury of your peers, made up of *American Indians,* the only true Americans, *black* Americans, Italian Americans, *Puerto Rican Americans,* that wouldn't find a man guilty unless they believed the Government's proof showed him guilty beyond a reasonable doubt.

What's the Government's proof? Special Agent Fernandez, Eddie Forte, *the Cuban brother from Miami,* 'Hey, bro, what's happening?' ...

\*　\*　\*　\*　\*　\*

*He's a Cuban-American man from Chicago. Israel's a Puerto Rican-American man.*

\*　\*　\*　\*　\*　\*

One *Latin brother to another Latin brother.* One *con man to another....* Maybe it was a chance for Israel to get some money out of this guy, to help his wife and kids. Israel wouldn't want to con somebody, this *Cuban guy from Miami,* in broad daylight with all *his Puerto Rican friends* buzzing him on North Ave."

In contrast to this constant repetition of Puerto Rican American on the part of defense counsel, the prosecutor merely stated in his introductory phrase during closing argument that he was a Puerto Rican American:

"First, as a Puerto Rican American, I have no quarrel with the history lecture that Mr. Parenti has given us."

[Objection]

"[The Court] Well I understand but I suppose, once again, that's a rhetorical device. It's unfortunate that we get that kind of matter introduced in the case on either side. Mr. Castillo, you will stick, if you will, with the argument as it deals with the issue."

The transcript quoted demonstrates that the judge bending over backward for the defendants immediately instructed the jury at the time of the alleged prejudicial com-

ment of the prosecutor to disregard this comment. It should be noted that the court immediately admonished the prosecutor despite the fact that defense counsel had made repeated references to the heritage of the defendants and witnesses during his closing argument. Where defense counsel suggest that minorities usually end up on the defense side of a criminal case, it was not inappropriate for the prosecution to point out that minorities are also represented on the side of the prosecution (agent Fernandez and Prosecutor Castillo). It is interesting to note that four of the participants in this trial scenario were of Latin heritage—the defendants Torres and Garcia, the government's main witness, agent Fernandez, and Prosecutor Castillo. The prosecution's statement certainly was not inappropriate in view of the repeated accusations referred to above (at least six times) of defense counsel that the government not only fabricated the case against Torres and Garcia, but did so without regard to their constitutional rights because they were Puerto Ricans. Since the evidence, including Torres' confession and his acts in furtherance of the robbery, overwhelmingly supports the jury's verdict of Torres' guilt, the prosecutor's closing remarks concerning his oath and Puerto Rican heritage would never "suffice to alter the outcome of the trial." The evidence clearly establishes that the defendant was not prejudiced by the prosecutor's remarks. Each of Torres' and Garcia's defense counsel continually raised the issue of the Government's offering perjured testimony with descriptive adjectives, e.g., "practicing," "rehearsing," and "preparing" its witnesses also "juicing up"[8] Torres' confession. Mr. Castillo's closing argument for the government was thus a response to the closing arguments of the defense counsel and his (prosecutor's) reference to the "oath" was nothing other than an invited response to the repeated accusations of the respective defense counsel. Since the jury acquitted Garcia of all charges, it is inconceivable that the prosecutor's remarks

---

**8.** *See* note 7, *supra.*

could have prejudiced the defendant Torres and not the defendant Garcia, especially since the same government witness testified against both Torres and Garcia, agent Fernandez, whom defense counsel accused of giving prepared, practiced and rehearsed testimony. As the court noted in *Saenz:*

"That the jury was not inflamed is demonstrated by the fact that one defendant was acquitted on all charges and three other defendants acquitted on at least one charge. This indicates to us that the jury carefully weighed the evidence against each defendant, acquitting when the evidence was insufficient. This reflects a logical approach to the deliberations, inconsistent with passion or prejudice."

747 F.2d at 942–43.

*See United States v. Brack,* 747 F.2d 1142 (7th Cir.1984). As the Supreme Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. Van Arsdall,* —— U.S. ——, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). A review of the entire record makes it eminently clear that the defendant received a fair trial since the evidence of Torres' guilt was overwhelming, as noted in section I of this opinion.

Both the prosecution *and* the defense have an obligation to conduct themselves in a professional and ethical manner at all times including trial. The prosecution's obligation is no greater than that of defense counsel, and defense counsel's is no greater than that of the prosecution, they are equal. The ABA Standards Relating to the Administration of Criminal Justice, Standard 4–7.8 make this obligation clear:

"Standard 4–7.8 Argument to the Jury

(a) In closing argument to the jury the lawyer may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct for a lawyer intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for a lawyer to express a personal belief or opinion in his or her client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence, or to attribute the crime to another person unless such an inference is warranted by the evidence.

(c) A lawyer should not make arguments calculated to inflame the passions or prejudices of the jury.

(d) A lawyer should refrain from argument which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict."

Where the prosecution's alleged improper conduct arises in response to the unprofessional and unethical conduct of defense counsel, focusing our review on only the prosecutor's conduct, as the concurring opinion suggests we do, ignores the obvious—the unprofessional conduct of defense counsel. Instead of arousing the jury against the prosecution, defense counsels' frequent accusations that the government offered perjured testimony might very well have backfired, and turned the jury against the defendants. Neither the government, nor the defense, nor the American system of justice, benefits from conduct of this type by members of the criminal bar. Thus, after reviewing the record and the oft-cited case law concerning the prosecution's closing argument, I conclude that the prosecutor's reference to his oath and Puerto Rican heritage did not prejudice Torres, and thus, do not constitute reversible error.

3. *Sentencing*

▮ The government requested that Torres be sentenced to a term of ten-years' confinement. Torres argues that the sentencing judge imposed Torres' seven-year sentence on an erroneous assumption that Torres, had he been convicted in the Illinois state system rather than the federal system, would have been sentenced to a mini-

mum of six years for armed robbery. From the fact that the jury acquitted him of those charges involving use of a weapon, Torres also infers that he would likewise have been acquitted of armed robbery in the state system. From this specious argument he takes another giant leap over a precipice of legal and logical wasteland and deduces that the trial judge's alleged reliance upon Illinois' six-year minimum sentence for armed robbery taints his sentencing, a novel but unconvincing argument. The sentence was within the statutory limit and therefore our discussion of this claim need not be lengthy.

A review of the sentencing record refutes Torres' contention. First of all, the trial court did not rely on a state six-year mandatory sentence for armed robbery to set a minimum sentence for Torres. On the contrary, it adverted to the state minimum sentence only as a reference point in determining Torres' sentence, explaining its reasoning as follows:

"Had you people been in the state court system, ... I think you would have been looking at the minimum term of six years ... Now I don't think it is fair to impose extra punishment on either of you because your intended victim turned out to be a federal officer. You didn't know that, but by the same token, I also don't think you ought to be rewarded with an easier sentence because your intended victim turned out to be a federal agent.... But I have also looked at your offenses, your crimes independently of a comparison with state law. Suppose that what I said about sentences is all wrong. Suppose ... that we ignore the possibility of the armed ... offense. Suppose we ignore that entirely. Still ... we are dealing with extremely serious offenses, deliberate armed robbery in daylight. Congress has just said recently that the institutions ought to be reserved for violent crimes.... You, Mr. Torres, have a history of some gun involvement ... what I find most troublesome is that every offense that you are involved in you portray as somebody else's doing. It is plain that you do not

accept responsibility ... Why are gun charges such serious charges? It is precisely because people do get excited, and when you get excited with a gun somebody can die.... All this leads me, not to the same kind of sentence that the government recommends imposing, but not far off."

Torres maintains that because the jury acquitted him of the "gun use" charges it was improper for the judge to sentence him based on the "assumption" that Torres participated in the commission of an armed robbery. As this court explained in *United States v. Madison*, 689 F.2d 1300 (7th Cir. 1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983), the judge at sentencing may consider all factors that are part of the defendant's pattern of criminal behavior, including pending or dismissed charges:

"... the federal rules allow a court to consider the defendant's entire criminal pattern of behavior when determining the defendant's character and propensity toward crime.... In light of the judge's duty to protect society and to impose a fair and just sentence upon the defendant it is only reasonable to allow the judge wide latitude in the type of information he can consider when sentencing. Moreover, our review of the federal rules and relevant case law reveals that a trial court may also consider dismissed charges as evidence of character when determining the length of the defendant's sentence. Therefore, because it is well within the discretion of a trial judge to rely upon factors such as the dismissed robbery charge only for purposes of showing a propensity toward criminal behavior, we hold there was no abuse of discretion."

689 F.2d at 1313.

Torres does not deny that Fernandez was robbed with a gun. There is substantial evidence in the record that Torres and Garcia discussed the plan to rob Fernandez. Torres and Garcia intended to take cash and jewelry from Fernandez, a person much larger than they were; Torres con-

vinced Fernandez to move to an isolated place to complete their deal; the alleged purpose of the meeting was the sale of a gun, thus Torres could hardly have been surprised that a gun was produced and used in the robbery. The trial judge was not required to draw an inference that is contrary to this overwhelming evidence merely because "through mistake, compromise, or lenity," *Powell*, 105 S.Ct. at 477, the jury reached an inconsistent verdict. We hold that the trial judge at sentencing properly considered the uncontroverted evidence that the robbery was accomplished with the use of a firearm, a dangerous and deadly weapon.

This seven-year sentence is well within the fifteen-year statutory limit.[9] Torres was not a one-time convict but a prior three-time loser with a criminal record involving drug use, one of which also included the use of a firearm. Furthermore, Torres was presently serving a thirty-month felony probation for possession of LSD at the time of the Fernandez robbery. Since Torres has failed to demonstrate that the trial court relied on improper or unreliable information in exercising its discretion in sentencing, and because the sentence is within the statutory limits, our appellate review of Torres' sentence is "at an end.". *United States v. Madison*, 689 F.2d 1300, 1312 (7th Cir.1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983) (quoting *United States v. Main*, 598 F.2d 1086, 1094 (7th Cir.1979)).

### III

We hold that the government produced more than sufficient evidence to support the jury's finding beyond a reasonable doubt that Torres was guilty of robbery, aiding and abetting, and conspiracy. Further, the closing argument of the prosecutor does not rise to the level of prejudicial error and does not require reversal of the defendant's convictions. The prosecutor's closing remarks certainly were proper under the doctrine of invited response in reply to defense counsels' innuendo that the government offered perjured testimony. Further, the trial judge's immediate ruling and instruction that the jury disregard the remarks of counsel for the government and for the defendants precludes a holding of prejudicial error. Finally, we hold that the trial court did not abuse its discretion in sentencing Torres to seven years on the robbery conviction. The trial court's sentence is within the statutory limits and based on accurate information properly presented to the court.

Accordingly, we affirm Torres' convictions and sentences for conspiracy, robbery, and conversion.

FLAUM, Circuit Judge, concurring.

I join in all of the majority opinion except part II, section 2, which discusses Torres' claim of improper argument by one of the prosecutors. I agree with Judge Coffey's conclusion that the prosecutor's remarks did not result in an unfair trial. I do not agree, however, that those remarks were invited by defense counsel's arguments.

In discussing Torres' improper argument claims, Judge Coffey chooses not to separate the issue of the propriety of the prosecutor's remarks from that of the effect of those remarks on the fairness of Torres' trial. As this court recently emphasized in *United States v. Reynolds*, 801 F.2d 952, 956 (7th Cir.1986), these issues are analytically distinct. In analyzing a claim of improper argument by the prosecution, the court must follow a two-step analysis. First the court must determine whether, considered in isolation, a challenged comment is improper. If the court finds that it is, the court then should reexamine the improper comment in light of the entire record to determine whether the improper comment deprived the defendant of a fair trial. *See Reynolds*, 801 F.2d at 956. Only

---

9. A violation of 18 U.S.C. § 371 (conspiracy) carries a possible imprisonment of five years. A violation of 18 U.S.C. § 641 (conversion) carries a punishment of imprisonment of a pos-sible ten years. A violation of 18 U.S.C. § 2112 (robbery) carries a possible imprisonment of fifteen years.

as part of the second step should the court consider whether, and to what extent, the impropriety was "invited" by the defense counsel's argument. *Reynolds,* 801 F.2d at 956; *United States v. Pollard,* 790 F.2d 1309, 1314 (7th Cir.1986).

The first remark Torres challenges as improper was made at the opening of rebuttal, when the Assistant United States Attorney commented "as a Puerto Rican American" on defense counsel's discussion of freedom and due process. Tr. 570. I agree with the district judge's description of this remark as "unfortunate." The remark was improper because the prosecutor's heritage was irrelevant. Nor can the remark be condoned as an "invited response" to an accusation that the prosecution was racially motivated. However, although the comment was inappropriate, it may well have reflected more harmfully upon the prosecution than the defense. Thus, I do not believe that the remark had any effect on the fairness of Torres' trial.

Torres' principal claim concerns the prosecutor's invocation of his "oath" when he assured the jury that he would not offer perjured testimony, *supra* at 439 (maj. op.). This attempt by the prosecutor to attest to his own good faith placed him in the inappropriate role of witness, and was therefore improper.[1]

Because this comment was improper, *Mazzone* requires an assessment of the effect of that testimonial assertion, in light of the entire record, on Torres' right to a fair trial. The majority applies the invited response doctrine to the prosecutor's remarks. However, I conclude that this doctrine is irrelevant here. The term "invited

response" does not invite prosecutors to respond to defense attorneys' inappropriate statements. *See United States v. Mazzone,* 782 F.2d 757, 763 (7th Cir.1986). The invited response doctrine is, in essence, a form of the harmless error doctrine under which courts determine whether defense counsel's improper argument has mitigated the effects of the prosecution's improper arguments. *Mazzone,* 782 F.2d at 763. The doctrine stems from the recognition that the fairness of the whole trial, and not of a single event in a trial, determines the validity of a criminal conviction. As the Supreme Court recently stated, "[T]he idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Darden v. Wainwright,* — U.S. —, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986).

Torres' counsel made two arguments that Judge Coffey views as having invited the prosecutor's improper remark: he argued that Torres' confession was "juiced up," and that the prosecution's witnesses had been rehearsed. I believe that the prosecutor's invocation of his oath cannot be considered an invited response to either argument.[2]

The defense counsel's suggestion that Torres' confession was "juiced up" contains no specific reference to either prosecutor. Thus, the prosecutor's response—the invocation of his oath—was inappropriate. Had the defense counsel's assertion been that the prosecutor knowingly offered perjured testimony, the response might well have been permissible. But defense counsel simply referred to "the prosecution"

---

1. Judge Coffey argues, *supra* at 439, that the "oath" the prosecutor referred to was his oath as a member of the bar, as opposed to the one he took when he became an Assistant United States Attorney. That reading of the comment seems unlikely in view of his reference to "[the other prosecutor] and our oath." There were other members of the bar present in the courtroom, including defense counsel, but the prosecutor only referred to his fellow Assistant United States Attorney. It does not matter what oath the prosecutor invoked; Torres' claim is that the prosecutor was personally vouching for the honesty of his witnesses.

2. I note that the prosecutor failed to object to the false confession argument or to pursue his objection to defense counsel's improper characterization of his interviews with Agent Fernandez. As we made clear in *Mazzone:* "If defense counsel exceed proper bounds in their closing arguments, the prosecutor can object; he can, if need be, ask that counsel be held in contempt for improper argument or questions ... but he cannot respond in kind and violate ethical standards himself." 782 F.2d at 762–63 (citation omitted).

and "the government." These references cannot be interpreted as challenges to the honesty of government counsel.

Similarly, I do not agree with Judge Coffey that the prosecutor's invocation of his oath can be balanced against the defense counsel's suggestions that Agent Fernandez's testimony was rehearsed or practiced.[3] The prosecutor's invocation of his oath might have been an appropriate response to an accusation of perjury. Defense counsel, however, made no such accusation; he merely directed attention to the effect repetition may have had on the witness' recollection of events. To the extent that defense counsel accused the government of misconduct by rehearsing the witness, the trial court properly criticized those remarks as without foundation.

Although trial counsel may legitimately mention the possible effects of trial preparation on a witness' recollection, he or she must avoid unfounded charges of misconduct. In this case, I do not believe that the defense counsel implied that the prosecutor provided Fernandez with a false version of events.[4]

Although, in my view, the prosecutor's improper reference to his oath cannot be considered an invited response, I nevertheless conclude that it did not deprive Torres of a fair trial. The remark was brief and, unlike those in *Mazzone,* was not repeated. The trial court immediately instructed the jury to disregard the remark. While that instruction perhaps could have been more vigorous, defense counsel did not request a more extensive instruction.[5]

This is not, as *Mazzone* demonstrates, the first time we have been faced with a prosecutor's invocation of an oath. I hope that our comments make clear that it is improper for a prosecutor to personalize his or her arguments. The doctrine of invited response is not a safety zone within which prosecutors may seek refuge.

---

**3.** Even the government has not argued that these remarks should be balanced; rather, it asserts only that the prosecutor proclaimed his honesty in response to the defense counsel's assertion that Torres' confession had been falsified. *Appellee's Br.* at pp. 14–15.

**4.** It is not by any means my intent to make a "hero" of defense counsel. The passages quoted by Judge Coffey, *supra* at 439, readily indicate that much of defense counsel's argument was irrelevant and perhaps not helpful to the jury. It is also true that, despite the trial court's reprimand, defense counsel continued to imply misconduct by the prosecution in preparing its witnesses. The proper response was further objection by the prosecutor. The prosecutor in this

case instead chose to take matters into his own hands.

**5.** I also note that the jury acquitted Torres' co-defendant and acquitted Torres on two of the five counts with which he was charged. The meaning of that verdict has been debated by the parties and discussed in the majority opinion in connection with another issue. In the context of this issue, however, it suggests to me that the jury did attempt to evaluate each count separately.

